*FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROSEDALE AND ROSEHILL CEMETARY ASSOCIATION, <br><br> Plaintiff, <br><br> v. <br><br> TOWNSHIP OF READING, et. al., <br><br> Defendants, <br><br> STATE OF NEW JERSEY, <br><br> Intervenor. | Civil Action No.:19-16428 (FLW) <br><br> **OPINION** |

**WOLFSON, Chief Judge**:

This matter concerns the constitutionality of the New Jersey Cemetery Act ("the Cemetery Act"), which, *inter alia*, empowers municipalities to consent to new cemeteries within their borders. *See* N.J.S.A. § 45:27-25, *et seq*. Rosedale and Rosehill Cemetery Association ("Plaintiff" or "Rosedale"), a non-profit cemetery company, applied to the Township of Readington and its Township Committee (collectively, "Defendants" or "the Township") to open a cemetery. After extensive negotiations with the Planning Board, and four days of hearings over the course of a year, the Township denied Rosedale's application pursuant to its authority under N.J.S.A. § 45:27-25(a).

Presently before the Court are the parties' Motions for Partial Summary Judgment on Counts Three through Five. Rosedale contends that two provisions of the Cemetery Act, N.J.S.A. § 45:27-25(a) and N.J.S.A. § 45:27-25(d), violate the Due Process Clause, *see* U.S. CONST. AMEND.

XIV, because they give the Township unfettered discretion to establish cemeteries. In its cross-motion, the Township contends that these provisions are a permissible delegation of state legislative power and that it properly denied Rosedale's application. The State of New Jersey has intervened to defend the constitutionality of the Cemetery Act on similar grounds as the Township. For the following reasons, I **GRANT** Rosedale's partial summary judgment motion and **DENY** the Township's cross-motion as follows: subsection (a) of N.J.S.A. § 45:27-25 of the Cemetery Act is unconstitutionally vague under the Due Process Clause of Fourteenth Amendment, and because subsection (a) cannot be severed from the rest of the provisions of § 45:27-25 (b)-(d), the entire N.J.S.A. § 45:27-25 is declared unconstitutional.  However, this Order shall be stayed for a period of 30 days before taking effect, to provide the New Jersey Legislature an opportunity to amend the statute.

## I.     BACKGROUND AND PROCEDURAL HISTORY

Rosedale has operated a large cemetery in Linden, New Jersey, for over a century. *See* Pl. Br., Ex. 5 (Hearing Transcript), at 9:6-12; Pl. SUMF, ¶ 4. Anticipating that it would soon run out of interment space, Rosedale sought to open a new cemetery nearby. *See* Pl. SUMF, ¶ 5. After a lengthy search for a suitable location, it contracted to purchase 180 acres in Readington Township in 2015 ("Block 12"). *Id.* ¶¶ 6-7. Among other factors, Block 12 was already zoned for cemetery use. *Id.* ¶¶ 12-13. Beginning on February 9, 2017, Rosedale dedicated several months to negotiating a site application with the Township's Planning Board. *Id.* ¶¶ 8, 10-13. Despite Rosedale's investment of time and resources in this process,[1] and despite seemingly having no obligation to wait, on September 17, 2017, the Board declined to hear Rosedale's final plan until the Township consented to the cemetery. *Id.* ¶ 13; Pl. Br., Ex. 9 (Letter from Planning Board

---

[1]     For example, Rosedale integrated a twenty-one page comment from a Planning Board engineer into its proposed design for Block 12.

Secretary). Rosedale submitted a request for consent on February 20, 2018, *see* Pl. SUMF, ¶ 14, and the Township held public hearings on May 21, 2018, September 17, 2018, October 15, 2018, and May 6, 2019. *Id.* ¶ 15; Pl. Br., Exs. 3-6 (Hearing Transcripts).

### A. *The Hearings*

During the hearings, Rosedale primarily contested the constitutionality of N.J.S.A. §§ 47:27-25(a) and (d). *See* Pl. Br., Ex. 3 (Hearing Transcript), at 9:24-13:23; Ex. 6 (Hearing Transcript), at 87:16-88:19. The statute provides in full:

> a. A cemetery shall not be established or enlarged in any municipality without first obtaining the consent of the municipality by resolution.
> b. No more than five cemeteries may be established in any one municipality, and not more than 3% of the area of any municipality shall be devoted to cemetery purposes.
> c. A cemetery shall not be established or expanded to exceed 250 acres at any one location.
> d. The governing body of a municipality, by resolution, may waive the limitations of subsection b. or c. of this section if it finds that there is a public need for additional cemetery lands and that it is in the public interest to waive them.
> e. A cemetery company shall not dedicate additional land to cemetery purposes without board approval.

N.J.S.A. § 47:27-25. Specifically, Rosedale argued that subsection (a), the consent provision, is unconstitutional because it fails to "specify[] any standards for such consent," Pl. Br., at 7, and that subsection (d), the waiver provision, likewise lacks a "sufficiently definite standard." *Id.*

Further, Rosedale argued that it did not need a waiver under subsection (d) because, based on its narrow reading of the Cemetery Act, there are not five cemeteries in the Township—and even if it did need a waiver, "there was a local and regional public need for an additional cemetery." *See* Pl. SUMF, ¶¶ 17-18, 21, 23. Rosedale presented expert testimony to this end, which showed that two cemeteries in the Township conduced just "one burial per month" even though "approximately 109 residents" died annually, *see* Pl. Br., Ex. 5 (Hearing Transcript), at 40:25-41:19; Ex. 15 (Newell Cemetery Report); Ex. 16 (Rural Hills Cemetery Report), no new cemeteries

had opened in the region in decades, *id.*, Ex. 5 (Hearing Transcript), at 31:16-19, and its proposed cemetery was "designed to serve a wide range of interment-related needs, including burial in a memorial park, indoor and outdoor niches, indoor crypts, mausoleums, a veterans area, a scattering garden, and green burial options."[2] *Id.*; Ex. 10 (Site Plan).

Rosedale also made extensive concessions to the Township over the course of the hearings. *See id.*, Ex. 3 (Hearing Transcript), at 22:13-23, 35:2-22. For example, Rosedale agreed to limit the size of the burial area to 38 acres in perpetuity; establish a designated burial area for veterans, the only one within 50 miles; screen all upright headstones from public view with buffers and setbacks; provide 73 acres to the Township for public space; implement a grass-mowing program to protect bird habitats; not to use herbicides, pesticides, or fertilizers in its operation; not to build a crematorium; and restore rather than raze preexisting buildings to preserve the agricultural character of the property. *Id.*, Ex. 3 (Hearing Transcript), at 20:19-20, 37:8-14, 56:2-23; Ex. 5 (Hearing Transcript), at 38:22-39:2; Ex. 10 (Site Plan); Ex. 14 (Letter Requesting Consent). In all, Rosedale estimated that it would perform three to four burials per day on Block 12 and 50,000 over the lifetime of the cemetery. *See* Pl. Br., Ex. 5 (Hearing Transcript), at 26:14-16, 65:22-66:18.

### B. *The Township's Decision*

On May 6, 2019, in its final hearing, the Township denied Rosedale's application. One Commissioner suggested that "if this were an application from a church . . . [it] would be a different story," *see* Pl. SUMF, ¶ 27; Pl. Br., Ex. 6 (Hearing Transcript), at 119:18-21, a sentiment with which the Mayor, who sits on the Committee, seemed to agree. *Id.* ¶ 28; Pl. Br., Ex. 6 (Hearing Transcript), at 120:16-22, 121:16-24. Others indicated a preference for farmland and a desire to

---

2    Rosedale presented other expert testimony in support of its application, including from a landscape architect, professional engineer, environmental specialist, traffic engineer, and hydrogeologist. *See* Pl. SUMF, ¶ 16. A nearby property owner opposed Rosedale's application and cross-examined its witnesses, but otherwise no parties objected. *See generally* Pl. Br., Exs. 3-6 (Hearing Transcripts).

avoid "ever-increasing traffic," raised concerns about "commercial business enterprise[s]" such as Rosedale even though Rosedale is a non-profit, yet objected to recouping "no tax benefit" at the same time, and argued that a cemetery is an inappropriate land use despite the fact that the Township's zoning ordinance allowed such a use at the time. *See, e.g.*, SUMF, ¶ 27; Ex. 6 (Hearing Transcript), at 119:3-25, 120:7-8, 121:13-15, 122:8-14, 122:21-23. In a subsequent Resolution— adopted on September 4, 2019, after Rosedale filed suit in state court—the Township asserted that N.J.S.A. §§ 45:27-25(a) and (d) are constitutional on their face and as applied to Rosedale, there are twenty-one cemeteries in Readington because the Cemetery Act broadly defines "cemetery," thus triggering subsection (d), and Rosedale is not entitled to a waiver because it "failed to demonstrate that . . . [another] cemetery would satisfy a public need or be in the public interest." *See* Def. Br., Ex. 7A (Resolution Denying Rosedale's Application). The Resolution ultimately denied "Plaintiff's request for consent to establish a cemetery within its borders pursuant to N.J.S.A. 45:27-25(a) and [] Plaintiff's request for a waiver pursuant to N.J.S.A. 45:27-25(d)." *See id.*; Def. SUMF, ¶ 12.

    *C.  The Parties' Present Dispute*

       Rosedale sued the Township in the Superior Court of New Jersey, Law Division, Hunterdon County, on June 19, 2019. *See* Compl., ¶ 44. The Township removed the matter to federal court on August 7, 2019. *See* 28 U.S.C. §§ 1334, 1441. Rosedale then filed an eighteen-count supplemental Complaint on October 31, 2019. Because the parties agreed to litigate Plaintiff's claims in a bifurcated manner, their present motions concern only the validity of two provisions in the Cemetery Act: N.J.S.A. § 45:27-25(a) and N.J.S.A. § 45:27-25(d). Count Three asserts that N.J.S.A. § 45:27-25(a) is both unconstitutional on its face and as applied, *see* Compl., ¶¶ 60-63, while Count Four asserts the same with respect to N.J.S.A. § 45:27-25(d). *Id.* ¶¶ 65-67.

Count Four further asserts that, even if subsection (d) is constitutional, the Township improperly denied Rosedale's waiver. *Id.* Additionally, Count Five asserts that Rosedale does not need a waiver under subsection (d) because of the way the Cemetery Act defines the word "cemetery." The parties agree to hold litigating all remaining claims pending the outcome of the motions here.[3] *See* Def. Br., Ex. 7G (Joint Scheduling Order).

### D. The Parties' Present Motions

Rosedale argues in its summary judgment motion that N.J.S.A. § 45:27-25(a) is unconstitutional because "it provides no standard whatsoever" to guide the Township's decision whether to consent to a new cemetery, thereby violating due process. Pl. Br., at 1. Rosedale also argues that, based on a narrow reading of the Cemetery Act, only cemeteries with a Certificate of Authority from the State—not "*every* area containing human remains," such as religious cemeteries, churchyards, and historic family gravesites—properly count toward the five-cemetery limit in N.J.S.A. § 45:27-25(b), and "any attempt [by the Township] to identify qualifying cemeteries must exclude . . . [these burial grounds]." *Id.* at 2. So construed, there are two—not over twenty—cemeteries in Readington, *id.*, which "eliminate[s] the need for a waiver." *Id.* Finally, even if there are more than five cemeteries in Readington, subsection (d)'s waiver provision, like subsection (a), "fails to provide a sufficiently clear municipal decision-making

---

3       Counts One, Two, Six, and Seven assert that the Township's decision to withhold consent was also arbitrary, capricious, and an abuse of discretion. *See* Compl., ¶¶ 53-54, 58, 69-71, 73-74. Rosedale then asserts various state and federal constitutional claims, including a violation of the First Amendment, *id.* ¶¶ 79-81 (Count Eight); New Jersey's Establishment Clause, *id.* ¶¶ 83-84 (Count Nine); procedural due process for denying a fully conforming conditional use application, *id.* ¶¶ 86-87 (Count Ten), hearing outside research and testimony, *id.* ¶ 89 (Count Eleven), and abusing the hearing procedures, *id.* ¶ 93 (Count Thirteen); and a taking. *Id.* ¶ 91 (Count Twelve). Further, Rosedale asserts various claims based on the Township's Resolution, including a violation of the New Jersey Open Public Meeting Act, *id.* ¶¶ 94-102 (Count Fourteenth), issuing a resolution without jurisdiction, *id.* ¶¶ 104-09 (Count Fifteen), and *ultra vires* acts. *Id.* ¶¶ 111-26 (Count Sixteen). Finally, Rosedale asserts violations of the New Jersey Civil Rights Act, *id.* ¶¶ 128-32 (Count Seventeen), and the Federal Civil Rights Act. *Id.* ¶¶ 134-38 (Count Eighteen).

standard in the manner due process requires." *Id.* at 3. Thus, Rosedale concludes, it is "free of the obligation to obtain the 'consent' of the Township's governing body . . . and . . . to pursue its application for site plan approval" with the Planning Board. *Id.* at 1-2.

The Township challenges each of these points in its cross-motion. First, because the legislature has the authority under state law to delegate the consent power to municipalities, there is no due process issue. The State of New Jersey advances a similar argument. *See* St. Br., at 14-17. Assuming due process applies, "although subsection (a) does not provide explicit standards for municipal consent, it is constitutional when read in conjunction with the remaining provisions," namely, "a 'public need' standard [from subsection (d)] is implied in subsection (a)."[4] Def. Br., at 4-5. And even if subsection (a) is unconstitutionally vague, rather than strike it down, the Court should order the Cemetery Board to issue regulations with a more detailed standard, postpone the effective date of the decision to give the legislature time to modify the statute, or sever it from the remainder of N.J.S.A. § 45:27-25. *Id.* at 5. Second, the Township argues that the Cemetery Act "applies to all" places containing human remains, not merely to "cemeteries with certificates of authority" from the State, such that there are many more than five in Readington, and Rosedale needs a waiver.[5] Def. Br., at 3; Pl. Br., at 8. Third, the "public interest" requirement in the waiver provision is a "constitutionally sufficient" standard for exercising discretion under subsection (d), which Rosedale has not met in this case. *Id.* at 4.

---

[4]    The State adds that subsection (a) is constitutional because a provision in New Jersey's Municipal Land Use Law supplies a standard restricting the Township's exercise of discretion, and because subsection (a) has existed for many years seemingly without challenge. *See* St. Br., at 10-12, 15-16.

[5]    The State splits the difference on this point, arguing that the definition includes cemeteries that are operated by religious organizations and that restrict burials to members of that faith, but does not include "privately-owned lands where remains have been buried." *See* St. Br., at 22-25.

E. *The Scope of This Opinion*

Before proceeding to discuss the substance of the parties' motions, I note that this Opinion only addresses the constitutionality of N.J.S.A. § 45:27-25(a) in Count Three.[6] Although Plaintiff argues in passing that it also brings an as-applied vagueness challenge, *see* Pl. Br., at 1 ("[Subsection (a)] is therefore void both on its face and as applied."), and the Township responds that such a challenge must fail because there is insufficient evidence of discriminatory enforcement, *see United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) ("An as-applied attack . . . does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right."), I decline to decide that issue, because I find subsection (a) to be facially unconstitutional.[7] Further,

---

[6]     Although the parties do not dispute whether Plaintiff has standing to challenge subsection (a), I must address that issue *sua sponte* because it affects the Court's subject matter jurisdiction under Article III. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006) ("We have an obligation to assure ourselves of litigants' standing under Article III."). To establish standing, a plaintiff needs to demonstrate injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). Where a plaintiff challenges multiple provisions in a statute, as here, it must meet the standing requirements for each provision. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31 (1990); *Comité de Apoyo a los Trabajadores Agrícolas v. Perez*, 148 F. Supp. 3d 361, 370-71 (D.N.J. 2015). Because Defendants' Resolution clearly denies Plaintiff's application under subsection (a) as well as (d), *see* Def. SUMF, ¶ 12; Def. Br., Ex. 7A (Resolution Denying Rosedale's Application), I find that Plaintiff has standing to challenge subsection (a).

[7]     That said, assuming Rosedale's allegations are true, this strikes me as a classic case in which discriminatory application proves, in part, facial infirmities. *See infra* (discussion of *Yick v. Hopkins*, 118 U.S. 356 (1886)). For example, at the final hearing on Rosedale's proposed cemetery, a Commissioner allegedly stated that, "[i]f this were an application from a church and congregants and family members and community members were running out of space, this would be a different story." *See* Pl. SUMF, ¶ 27; Pl. Br., Ex. 6 (Hearing Transcript), at 119:1-8-120:1. Similarly, the Mayor allegedly made the following comment: "Readington's population is, you could say, surprisingly or alarmingly or whatever, majority Catholic. And most of the people who – most of – certainly the local funeral homes, both of them really, deal largely with people who die in Readington and are buried in Catholic cemeteries in the area . . . . I think, and maybe this is the wrong thing to say, . . . I don't think this was the vision that [local zoning ordinances had] for a cemetery. I think they were talking about small church cemeteries, not a gigantic cemetery run by an out-of-town corporation that really has no connection to Readington." *See* Pl. Br., Ex. 6 (Hearing Transcript), at 120:16-121:24. Although Defendants argue that these comments were merely "in artfully [sic] stated," Def. Br., at 16, to the extent that they are true, there is merit to Rosedale's as-applied challenge to N.J.S.A. § 45:27-25(a).

because I find that subsection (a) is not severable from N.J.S.A. § 45:27-25 on the whole, which dooms the remaining provisions in that statute, I need not decide whether subsection (d) is a standardless delegation of power or whether the Cemetery Act narrowly defines the word "cemetery" such that Rosedale does not need a waiver at all.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment shall be granted if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A dispute is "genuine" when "a reasonable jury could return a verdict for the nonmoving party" based on the evidence in the record. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "material" when it "might affect the outcome of the suit under the governing law." *Id.* In deciding a summary judgment motion, the court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III.    DISCUSSION

### A. *The Constitutionality of the Municipal Consent Provision in Subsection (a)*

The gravamen of Plaintiff's constitutional challenge is that a standardless delegation by a legislature to a municipality—such as the one in N.J.S.A. § 45:27-25(a)—violates the Fourteenth Amendment's Due Process Clause. *See* Pl. Br., at 11-23. In particular, because subsection (a) does not define the circumstances under which Defendants may withhold consent, or otherwise provide guidelines as to their exercise of discretion, the provision is void for vagueness. *See id.* at 11-12 ("On its face . . . [subsection (a)] supplies no standard or principle."). Defendants disagree, contending, first, that I should not decide this case under due process, a position the State advances

9

in even stronger terms. *See* St. Br., at 14-17. Assuming due process applies, Defendants contend that the vagueness doctrine does not invalidate subsection (a) because it is a civil provision, which is entitled to a greater degree of imprecision. *See* Def. Reply Br., at 7. Finally, Defendants argue that the context of the statute, mainly subsection (d), implies a standard in any event. The State adds that subsection (a) borrows a standard from the Municipal Land Use Law to restrain the Township's discretion, and that it is nevertheless constitutional because "for more than 100 years" it has not been "challenged." *See* St. Br., at 15.

The Fourteenth Amendment provides that no state "shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV. The Supreme Court has invoked the Due Process Clause to void a statute if it is excessively vague, *i.e.*, "its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The vagueness doctrine "addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see also Greyned*, 408 U.S. at 108-09 (stating that vague laws "offend several important values" including "fair notice" and "explicit standards for those who apply them," which are the "basic principle of due process").

Hence, if a state or federal statute, or local ordinance, fails to give "a person of ordinary intelligence fair notice" of what is prohibited or required, then it is void for vagueness. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 167 (1972) (invalidating a local vagrancy ordinance on its face in part because it was "so all-inclusive and generalized" as to enable "men to be caught, . . . although not chargeable with any particular offense"); *see also United States v. Harriss*, 347 U.S. 612, 617 (1954) (describing "[t]he constitutional requirement of definiteness"

in the context of fair notice); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20-22 (2010) (analyzing the "fair notice" prong of the vagueness doctrine in an as-applied challenge to a federal statute). The same is true if the statute is "so standardless that it authorizes or encourages seriously discriminatory enforcement" or arbitrary decision-making. *Skilling v. United States*, 561 U.S. 358, 416 (2010) (analyzing the "arbitrariness" prong of the vagueness doctrine in a facial challenge to a federal statute) (quotations omitted); *Papachristou*, 405 U.S. at 168-170 (invalidating the local ordinance in part because it gave officials "unfettered discretion"); *see also United States v. Williams*, 553 U.S. 285, 304 (2008) (explaining the vagueness doctrine in the context of due process); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1216 (2018) (stressing that the purpose of the vagueness doctrine is due process, and invalidating a federal statute on its face for "produc[ing] more unpredictability and arbitrariness than the Due Process Clause tolerates").

         i.    <u>New Jersey's Non-Delegation Doctrine and Federal Due Process</u>

As a preliminary matter, Defendants argue that I should decide the constitutionality of subsection (a) under New Jersey's non-delegation doctrine because Plaintiff's Complaint fails to specifically plead due process. *See* Def. Reply Br., at 5-7. I reject this argument. Consistent with longstanding notice-pleading rules, a complaint is not intended to be exhaustive, need not name every source of law under which a plaintiff may be harmed, and will not be penalized for failing to invoke magic legal words. *See Weston v. Pennsylvania*, 251 F.3d 420, 429 (3d Cir. 2001) ("Complaints need not plead law or match facts to every element of a legal theory.") (quotations omitted). Instead, it need only "limn[] the claim; details of both fact and law come later, in other documents." *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992); *N.A.A.C.P. v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 292 (7th Cir. 1992) ("A complaint should limn the grievance and demand relief. It need not identify the law on which the claim rests."); *see*

*also Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) ("Federal pleading rules call for 'a short and plain statement of the claim showing that the pleader is entitled to relief,' . . . [T]hey do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted.") (quoting Fed. R. Civ. P. 8(a)(2)).

Plaintiff states in Count Three that subsection (a) fails to circumscribe the Township's discretion in any meaningful way and that the legislature must prescribe standards to govern the power it delegates, or else it impermissibly confers "unfettered discretion." *See* Compl., ¶¶ 60-63. Although the Complaint does not use the term "due process" here, the absence of those words does not foreclose that clause as the source of Plaintiff's constitutional claim. *See Bartholet*, 953 F.2d at 1078 ("Instead of asking whether the complaint points to the appropriate statute, a court should ask whether relief is possible under any set of facts that could be established consistent with the allegations."). Vagueness is undeniably the "limn" of Count Three, and vagueness quintessentially underlies due process; thus, the facts here allow a due process analysis, regardless of the provision in the constitution to which Plaintiff traces the wrong.

In asking this Court to pass on Plaintiff's vagueness claim without addressing due process, Defendants ignore their inherent relationship, whether it be civil or criminal, which the Supreme Court has "repeatedly pointed out in [its] decisions." *Cramp v. Board of Public Instruction of Orange County, Fla.*, 368 U.S. 278, 279 (1961); *Lanzetta v. State of New Jersey*, 306 U.S. 451, 453 (1939) ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes."); *see also Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926) (explaining that "sufficiently explicit" statutory terms "is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law"); *Jordan v. De George*, 341 U.S. 223, 231-32 (1951) ("Despite the fact that this is not a criminal statute, we shall

nevertheless examine the application of the vagueness doctrine to this case."); *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1961); *Giaccio v. Pennsylvania*, 382 U.S. 399, 402 (1966); *Coates v. City of Cincinnati*, 402 U.S. 611, 613-14 (1971); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497-98 (1982); *Papachristou*, 405 U.S. at 162, 170-71; *Humanitarian Law Project*, 561 U.S. at 20; *Skilling*, 561 U.S. at 412-13; *Fox*, 576 U.S. at 253; *Williams*, 553 U.S. at 304; *Dimaya*, 138 S. Ct. at 1212-1216; *Grayned*, 408 U.S. at 108-109 (collecting cases).

The vagueness doctrine has *always* been "an outgrowth . . . of the Due Process clause." *Williams*, 553 U.S. at 304. For example, the earliest reported federal vagueness case, *The Enterprise*, 8 F. Cas. 732 (C.C.D.N.Y. 1810), spoke unmistakably in terms of fair notice: if "ignorance [of what the law requires] be the consequence of an ambiguous or obscure phraseology, some indulgence is due to it." *Id.* at 734. In *United States v. Sharp*, 27 F. Cas. 1041 (C.C.D. Pa. 1815), decided just a few years later, the court emphasized both fair notice and arbitrariness: "all men, subject to their penalties, . . . [must] know what acts it is their duty to avoid," and there is a "natural repugnance, to selecting from this mass of definitions, one, which may fix a crime . . . when, by making a different selection, it would be no crime at all." *Id.* at 1043. Early state cases took a similar tack. *See, e.g.*, *McConvill v. Mayor and Aldermen of Jersey City*, 39 N.J.L. 38, 42 (1876) (explaining that laws "ought to be expressed in such a manner as that [their] meaning may be unambiguous, and in such language as may be readily understood by those upon whom [they are] to operate"). And in a series of cases from the turn of the twentieth century, the Supreme Court invalidated various laws as "contravening the due process clause of the Fifth Amendment . . . because [they] required that the transactions named should conform to a rule or standard which was so vague and indefinite that no one could know what it was." *A.B. Small Co. v. American Sugar Refining Co.*, 267 U.S. 233, 238-39 (1925); *United States v. Cohen Grocery Co.*, 255 U. S.

81, 90-92 (1921) (collecting cases); *Weeds Inc. v. United States*, 255 U. S. 109, 112 (1921); *cf. Int'l Harvester Co. of America v. Com. of Kentucky*, 234 U.S. 216, 221-22 (1914) (considering whether a "law as construed offers no standard of conduct that it is possible to know," and whether "a combination invited by the law is required to guess at its peril what its product would have sold for," and holding that it does not because it merely "throws upon men the risk of rightly estimating a matter of degree").

Defendants seem to advocate for Justice Thomas' minority position in *Dimaya* that, if the vagueness doctrine has any roots in the Constitution at all, it is in the separation of powers. *See Dimaya*, 138 S. Ct. at 1248 (Thomas, J., dissenting) ("[P]erhaps the vagueness doctrine is really a way to enforce the separation of powers—specifically, the doctrine of nondelegation."); *id.* at 1224 (Gorsuch, J., concurring) ("[N]ow again today Justice Thomas has questioned whether our vagueness doctrine can fairly claim roots in the Constitution as originally understood."). It is clear why Defendants would take such a position. In Justice Thomas' view, a federal court could not rely on the principles of fair notice or arbitrariness embodied in the Due Process Clause to invalidate a state law or local ordinance—rather, only on the state's non-delegation doctrine—because separation of powers is a federal issue.

Yet, the Supreme Court has rejected this distinction. A vague law fails because it does not provide the customary protection of fair notice to those who must follow it, *see Connally*, 269 U.S. at 391, leaving the "line between what is lawful and unlawful . . . left to conjecture," *id.* at 393, and because it enables enforcement officials to "shap[e]" the law's "contours" as they see fit. *Dimaya*, 138 S. Ct. at 1228 (Gorsuch, J., concurring). This "invite[s] arbitrary power" while keeping "people in the dark about what the law demands," *id.* at 1223-24, and permits governments to "condem[n] all that [they] personally disapprove and for no better reason than that [they]

disapprove it." *Jordan*, 341 U.S. at 242 (Jackson, J., dissenting)). Regardless of whether Plaintiff expressly pleads the Due Process Clause in its Complaint, then, I reject Defendants' position that Plaintiff's vagueness claim does not support such a challenge.

Defendants next cite various cases concerning the permissibility of legislative delegations under state law, drawing the conclusion that "a federal due process claim is not proper in this context" and that the division of power among the branches of state government is up to the states. *See* Def. Reply Br., at 6-7. The State of New Jersey makes a similar argument, starting from the premise that "[t]he exercise of legislative judgment [to delegate a state power] is not subject to judicial superintendence unless it is plainly beyond the realm of the police power or palpably unreasonable." St. Br., at 15. This is entirely uncontroversial. In New Jersey, "[i]t is well-established that within limits the legislature may delegate its authority." *Mount Laurel Twp. v. Dep't of Public Advocate*, 83 N.J. 522, 532 (1980). Because New Jersey courts view delegations "with a liberal eye," *Montgomery Nat'l Bank v. Clarke*, 703 F. Supp. 1161, 1168 (D.N.J. 1989), *aff'd*, 882 F.2d 87 (3d Cir. 1989), they will not "intervene unless the legislative decision is palpably arbitrary." *Shelton College v. State Bd. of Educ.*, 48 N.J. 501, 518 (N.J. 1967).

It is also well-established that a state legislature's choice to delegate its power, as well as the extent of the delegation, is not a federal matter. The legality of those decisions is a "question for the state itself." *Highland Farms Dairy v. Agnew*, 300 U.S. 608, 612 (1937) (rejecting the argument that a state law delegating the power to regulate prices was unlawful under the Constitution); *see also Women's Health Services, Inc. v. Maher*, 514 F. Supp. 265, 271-72 (D. Conn. 1981) ("This Court must adhere to the *Highland Farms Dairy* principle that the broad scope or vague boundaries of a state legislature's definition of [delegated] powers are not of federal constitutional concern."). As such, the state legislature plainly has the power to delegate to

municipalities the authority to approve the establishment or expansion of cemeteries. *See, e.g.*, *Kozesnik v. Montgomery Twp.*, 24 N.J. 154, 167 (1957) ("[T]he zoning statute delegates legislative power to local government. The judiciary of course cannot exercise that power directly . . . . We may act only if the presumption in favor of the ordinance is overcome by a clear showing that it is arbitrary or unreasonable."); *State v. State Board of Health*, 67 N.J.L. 463 (1902) (holding that the Health Board acted properly in hearing an appeal to a municipal decision under subsection (a)). In fact, the Cemetery Act preempts the field of cemetery regulation. *See Trinity Cemetery Ass'n, Inc. v. Twp. of Wall*, 325 N.J. Super. 292, 295 (App. Div. Oct. 15, 1999).

However, Plaintiff does not challenge this premise, nor base its Complaint on a narrow reading of the State's delegation doctrine. In other words, Plaintiff does not argue that the Township lacks the power to consent altogether, or that the legislature lacked the authority to pass the consent law in the first instance. Plaintiff readily concedes that "the State may delegate to municipalities the power to approve or reject" new cemeteries within town borders. Pl. Reply Br., at 3 (emphasis removed). Plaintiff instead challenges the substance of the delegation: whether the Cemetery Act conferring the consent power also contains "sufficient standards to guide" the Township's deliberations, limit its discretion, and "apprise the public of the bases on which new cemeteries will be approved or rejected." *Id.* Defendants and the State fail to substantively respond to Plaintiff's claim in this regard.

Defendants and the State also draw an erroneous conclusion from their premise: because this case involves a permissible delegation under state law, it cannot involve a due process violation under federal law. The State goes so far as to assert that "[t]he Legislature . . . need not impose standards upon a discretionary power long understood to be reserved to municipalities." St. Br., at 12 (citing *Trinity Cemetery Ass'n v. Twp. of Wall*, 170 N.J. 39, 53-54 (2001) (Zazzali,

J., concurring)). By its terms, however, the Fourteenth Amendment subjects state actions to the Due Process Clause, regardless of whether they are permissible exercises of state power under state law. U.S. CONST. AMEND. XIV; *see also Papachristou*, 405 U.S. 156 (rejecting a local vagrancy ordinance on due process grounds). That is the very purpose of the Amendment. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 59 (1996) ("[T]he Fourteenth Amendment, by expanding federal power at the expense of state power, had fundamentally altered the balance of state and federal power struck by the Constitution."); *City of Boerne v. Flores*, 521 U.S. 507, 524 (1997) ("As enacted, the Fourteenth Amendment confers substantive rights against the States which, like the provisions of the Bill of Rights, are self-executing.").

Citing *Montgomery*, 703 F. Supp. 1161, Defendants advance the same flawed position. *See* Def. Reply Br., at 5-8. To the contrary, that case, which involved the New Jersey Banking Commissioner's authority to waive a statutory prohibition on new branches in small towns "if he decides that the establishment of such banks is in the public interest," N.J.S.A. § 17:9-A-19K, cuts the other way. The plaintiff in *Montgomery* alleged that the "public interest" standard was void for vagueness. 703 F. Supp. at 1165. Eliding the distinction between a challenge to a delegation of state power itself and a challenge to the standards governing the *exercise of* the delegated power, the district court held that the plaintiff's vagueness claim was "outside the scope of . . . the fourteenth amendment." *Id.* at 1167. Although the Third Circuit rejected the plaintiff's claim on appeal, it fully reviewed the merits of the due process argument under longstanding federal precedent governing that issue, a clear rejection of the district court's legal conclusion that the Due Process Clause was inapplicable. *Montgomery*, 882 F.2d at 89-91.

The State seems to recognize what Defendants do not, maintaining that municipalities may not "exercise their authority . . . in ways which conflict with provisions of the federal or state

constitutions." N.J. Br. at 11. They even cite to *West Point island Civic Ass'n v. Twp. Comm. of Dover*, 54 N.J. 339 (1969), for the proposition that "the discretionary activity of municipal governing bodies in this state has traditionally been subject to close judicial scrutiny in order to prevent arbitrary and unreasonable action." *Id.* at 346. Plainly, then, an impermissible delegation of a state power, which is a matter of state law, is not the same as a permissible delegation of state power with impermissibly vague standards for its exercise, which is a matter of federal due process, as here. And the lawfulness of a delegation, alone, cannot save a statute from a federal or a state due process challenge.[8] Defendants and the State misconstrue the scope of the vagueness doctrine, which "does not forbid the legislature from acting toward any end it wishes, but only requires it to act with enough clarity that reasonable people can know what is required of them and [officials] can apply the law consistent with their limited office." *Dimaya*, 138 S. Ct. at 1223 (Gorsuch, J., concurring).

I therefore proceed to analyze Plaintiff's vagueness claim under the Due Process Clause, while recognizing that the consent provision in the Cemetery Act is a permissible delegation of state power.

---

8       New Jersey courts have long enforced due process on this basis. *See, e.g.*, *Weiner v. Borough of Stratford*, 15 N.J. 295, 298-300 (1954) (holding that "the municipality has a broad grant of police powers to enact ordinances not prohibited by or inconsistent with the Federal or State Constitutions or other statutes," and explaining the difference between the existence of a municipal power and the existence of standards governing the exercise of that power); *Twp. of Raritan v. Hubb Motors, Inc.*, 26 N.J. Super. 409, 410 (App. Div. June 29, 1953) ("[The] power of a municipality is always subject to the provision that the ordinance must not be unreasonable, arbitrary or discriminatory, and must lay down a standard or norm for the guidance of the authority."); *Group Health Ins. of N.J. v. Howell*, 40 N.J. 436, 447 (1963) ("[T]he statute sets forth no standards or safeguards to protect against unfairness, arbitrariness, or favoritism, and is therefore void for lack of due process."); *Abelson's, Inc. v. New Jersey State Board of Optometrists*, 5 N.J. 412, 424 (1950) ("The conduct thus inhibited is not that which in law and in fact is of a character likely to 'deceive or defraud the public,' words of definite and certain meaning, but that which 'in the opinion of the board' is of that character. This subjective test of conduct meriting disapproving action is so vague, indefinite, and uncertain as to render the provision void for want of due process."); *Cammarata*, 26 N.J. at 410 (holding that a delegation of state legislative power will survive scrutiny under the New Jersey Constitution only if it is "'hemmed in by standards sufficiently definite to guide its exercise").

ii.    The Standard When Reviewing A Statute for Vagueness

Defendants next challenge the standard of review under the vagueness doctrine. Specifically, they argue that subsection (a) is not unconstitutionally vague because courts require less precision in civil statutes than criminal ones. *See* Def. Br., at 12-14; Def. Reply Br., at 7. Defendants are correct that the Supreme Court has sometimes "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Hoffman*, 455 U.S. at 499. But the "happenstance" that a law is civil rather than criminal is by no means "dispositive," *Dimaya*, 138 S. Ct. at 1223 (Gorsuch, J., concurring), and the conceptual foundation of that distinction is increasingly in doubt. *Id.* at 1223-31.

As a basic proposition, a vague civil law can invite an arbitrary exercise of power, leave citizens in the dark as to how to arrange their affairs, and discriminate on an ad hoc basis no less than a vague criminal law. *See, e.g.*, ALEXANDER BICKEL, THE LEAST DANGEROUS BRANCH 151 (1962) ("[A] loosely worded statute allows latitude for 'discontrol, irrationality, and irregularity,' for erratic, prejudiced, discriminatory, or overreaching . . . exercises of authority.") (citations omitted). As a matter of history, the vagueness doctrine has never exclusively operated on criminal laws. *See Giaccio*, 382 U.S. at 402 (stating that due process protections against vague laws are "not to be avoided by the simple label a State chooses to fasten upon its conduct or its statute"); *De George*, 341 U.S. at 231-32 ("Despite the fact that this is not a criminal statute, we shall nevertheless examine the application of the vagueness doctrine to this case."); *A.B. Small Co.*, 267 U.S. at 239 ("The defendant attempts to distinguish [prior vagueness] cases because they were criminal prosecutions. But that is not an adequate distinction."); *Int'l Harvester Co.*, 234 U.S. at

19

221-22 (applying the vagueness doctrine to a civil fine for a combination in restraint of trade); *Montgomery*, 882 F.2d at 89 (applying the vagueness doctrine to a civil banking regulation); *see also Drake v. Drake*, 15 N.C. 110, 115 (1833) ("[I]f the terms in which [a law] is couched be so vague as to convey no definite meaning to those whose duty it is to execute it, either ministerially or judicially, it is necessarily inoperative."); *Commonwealth v. Bank of Pennsylvania*, 3 Watts & Serg. 173, 177 (Pa. 1842) ("We have seldom, if ever, found the language of legislation so devoid of certainty as in the proviso [regulating voting shares for certain stockholders of the Bank of Pennsylvania] before us."); *Goldington v. Bassingburn,* Y.B. Trin. 3 Edw. II, f. 27b (1310) (explaining, in the civil context, that it was "the law of the land" that "no one [could] be taken by surprise" by having to "answer in court for what [one] has not been warned to answer"). Indeed, from the 1920s on, the Supreme Court itself has forcefully applied the vagueness doctrine in civil actions. *See, e.g.*, *A.B. Small Co.*, 267 U.S. at 239 ("The ground or principle of [the vagueness doctrine is] not such as to be applicable only to criminal prosecutions . . . . but the exaction of obedience to a rule or standard which was so vague and indefinite as to really be no rule or standard at all."); *Cohen*, 255 U.S. at 92 (collecting cases).

And "if the severity of the consequence counts" when determining the standard of review for vagueness, *Dimaya*, 138 S. Ct. at 1229 (Gorsuch, J., concurring), then it is hard to see how civil statutes with restrictions that can result in severe consequences, perhaps even more so than some criminal statutes, should require lesser due process protections. *Id.* at 1229-30 (listing examples). For these reasons, I reject Defendants' contention that the civil nature of subsection (a) is, by itself, grounds for dismissing Plaintiff's due process claim.

Still, it is widely accepted that "economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, [] because businesses, which face economic

demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action," and because "the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Hoffman*, 455 U.S. at 498 (citations omitted). Another reason for a less stringent standard when reviewing economic regulations for vagueness is that they often confer benefits rather than impose burdens, *i.e.*, involve regulatory beneficiaries not regulatory objects. Hence, "[i]n the field of regulatory statutes governing business activities, where the acts limited are in a narrow category, greater leeway is allowed." *Papachristou*, 405 U.S. at 162; *see also Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340 (1952) (holding that, as to a statute criminalizing the use of certain routes when transporting explosives, "no more than a reasonable degree of certainty [as to the prohibited conduct] can be demanded"); *United States v. National Dairy Products Corp.*, 372 U.S. 29, 32 (1963) ("[S]tatutes [criminalizing selling goods at unreasonably low prices] are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language."); *United States v. Petrillo*, 332 U.S. 1, 8 (1947) ("The language here challenged conveys sufficiently definite warning as to the proscribed conduct [limiting the number of employees a business needs] when measured by common understanding and practices. The Constitution requires no more.").

Consistent with this principle, courts in the Third Circuit have applied a less stringent standard of review to zoning and zoning-adjacent business regulations, such as the present one. In *Adhi Parasakthi Charitable v. Twp. of W. Pikeland*, 721 F. Supp. 2d 361 (E.D. Pa. 2010), for example, the court rejected a vagueness challenge to a zoning ordinance because the ordinance "set[] forth the considerations for the Zoning Board in determining whether to grant a conditional-use application" and made clear that "conditional use must be granted not only before construction,

but also before certain uses are made of the property," which put the plaintiff on notice and rendered his due process argument without "much force." *Id.* at 377, 380 n.4. Likewise, in *CMR D.N. Corp.*, 829 F. Supp. 2d 290, *aff'd*, 703 F.3d 612, the court upheld a local zoning ordinance against a vagueness challenge because "it would be impossible for [such an ordinance] to identify specifically each and every permitted use" that is "appropriate for the density, character, . . . and surrounding community," a phrase in the regulation which itself sufficiently limited the zoning board's discretion. *Id.* at 298 n.9, 299. The Third Circuit has therefore held that, "to find an economic civil statute void for vagueness, it must be so vague as to be no standard or rule at all." *CMR D.N. Corp*, 703 F.3d at 632 (quotations omitted).

Taking these bodies of law into consideration, I will evaluate "the degree of imprecision" in subsection (a) based on whether it provides Plaintiff with fair notice and contains some standard to guide the Township's consent, keeping in mind that, as an economic regulation, a degree of flexibility is permitted.

### iii.   Applying the Vagueness Standard to Subsection (a)

Plaintiff argues that subsection (a) is a standardless delegation of power, *see* Pl. Br., at 13-21, while Defendants respond that subsection (d) provides the adequate standard. *See* Def. Br., at 4-5. The State adds that subsection (a) borrows a standard from the Municipal Land Use Law and that the passage of time renders it constitutional in any event. *See* St. Br., at 15-16.

As discussed, *supra*, Plaintiff brings a facial challenge to subsection (a). *See, e.g.*, Pl. Br., at 12 n.3 ("In all circumstances, [the provisions] delegate arbitrary, standardless decision-making authority to municipal officials."). This type of challenge seeks to invalidate a statute itself, rather than its application to a particular party under a particular set of facts. It is "the most difficult challenge to mount successfully," *United States v. Salerno*, 481 U.S. 739, 745 (1987), because

Plaintiff "must establish that no set of circumstances exists under which the Act would be valid." *Id.*; *see also United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011). In other words, Plaintiff must show that the statute "is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). The remedy for a successful facial challenge is to strike down the unconstitutional law or provision, whereas for an as-applied challenge the remedy is an injunction against enforcement as to that plaintiff only. *See CMR D.N. Corp.*, 703 F.3d at 624.

As to the starting point for a facial attack, I must "look to the law as a whole to determine whether a person of ordinary intelligence may be able to ascertain the meaning of the challenged terms." *Id.* at 631; *see also Grayned*, 408 U.S. at 110. And "some ambiguities" will not "render [the statute] impermissibly vague." *Hoffman*, 455 U.S. at 502 (upholding an ordinance that did "contain ambiguities"). But Defendants' conclusion that subsection (a) incorporates the "public need" or "public interest" standard from subsection (d), and as such is constitutional, falls short for two basic reasons. First, subsection (d) explicitly mentions subsections (b) and (c), but omits any mention of subsection (a), despite multiple revisions over the last 50 years. This raises the inference that subsection (d) intends to exclude, and hence not operate on or restrict, subsection (a). *See, e.g.*, *N.L.R.B. v. SW General Inc.*, 137 S. Ct. 929, 940 (2017) (explaining that a negative implication can be drawn where "the circumstances support a sensible inference that the term left out must have been meant to be excluded," as here); *Marx v. General Revenue Corp.*, 568 U.S. 371, 381 (2013) ("The force of any negative implication [] depends on context."); *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (explaining that a negative implication can be drawn when "it is fair to suppose [a legislature] considered the unnamed possibility and meant to say no to it"); *United States v. Vonn*, 535 U.S. 55, 65 (2002) (explaining that a negative implication can

be overcome by "contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion"). In other words, because "[t]here is a basic difference between filling a gap left by [the legislature's] silence and rewriting rules that [the legislature] has affirmatively and specifically enacted," *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978), subsection (d) cannot be read to limit the scope of the consent power in subsection (a).

Second, because the text of subsection (a) does not contain a reference to the limiting principles in subsection (d), or any other limiting principles for that matter, it cannot be read to incorporate the words of limitation expressed in subsection (d). A municipality acting under its subsection (a) authority may clearly contemplate a far wider range of considerations than "public interest" or "public necessity"—so much so that Plaintiff argues it is unconstitutional. *See infra*. Defendants' interpretation would nevertheless "have [me] read an absent word into the statute," *Lamie v. United States Trustee*, 540 U.S. 526, 538 (2004), resulting "not [in] a construction of [the] statute, but, in effect, a[] [narrowing] of it by the court, so that what was omitted [in subsection (a)] . . . may be included." *Iselin v. United States*, 270 U.S. 245, 251 (1926). In view of the unambiguous text of the provision, I am unwilling to "soften the import" of the New Jersey Legislature's "chosen words" by borrowing limitations from subsection (d), *Lamie*, 540 U.S. at 538, or otherwise "supply[ing] omissions." *Nichols v. United States*, 136 S. Ct. 1113, 1118 (2016) (further citation omitted). Simply, "it is not within [the courts'] power to . . . narrow state laws" in the manner requested by Defendants. *Greyned*, 408 U.S. at 110; *see also United States v. Thirty-seven (37) Photographs*, 402 U.S. 363, 369 (1971) (explaining that "it is for Congress, not this Court, to rewrite the statute"); *Freedman v. Maryland*, 380 U.S. 51, 58 (1965) (declining to rewrite Maryland's statute); *Teitel Film Corp. v. Cusack*, 390 U.S. 139, 141 (1968) (same, but with

24

Chicago's ordinance). I thus reject Defendants' invitation to "add an extra clause" to subsection (a). *Id.*

For similar reasons, I reject the State's argument that subsection (a) borrows a provision from the Municipal Land Use Law ("the MLUL"), *see* N.J.S.A. § 40:55D-1, to restrain Defendants' exercise of discretion. The MLUL "guide[s] the appropriate use or development of all lands in this State in a manner that will promote public health, safety, morals, and welfare of their inhabitants." St. Br., at 11. Municipalities "must exercise their authority in strict conformity with [it]." *Id.* (citing *Riggs v. Twp. of Long Breachi*, 109 N.J. 601, 611 (1988) (stating that every zoning ordinance "must advance one of the purposes of the [MLUL].")). Even so, the MLUL is a land *use* statute, which restricts a municipality's *zoning* authority—*i.e.*, what sort of development should happen where, and how townships should "draw[]" their zoning ordinances in the first instance. *Lusardi v. Curtis Point Prop. Owners Ass'n*, 86 N.J. 217, 226-27 (1981) ("One standard contained in the [MLUL] is that municipalities should encourage uses that are appropriate to particular locations."). Importantly, it is silent as to the exercise of other municipal powers, such as the consent power here. The State arguably concedes this point by noting that "a governing body's decision [under the Cemetery Act] is not a zoning decision *per se.*" *See* St. Br., at 18.

Second, the MLUL standard cited by the State does not appear anywhere in the thirty-eight provisions of the Cemetery Act, much less the provisions of N.J.S.A. § 45:27-25, in particular. There is no basis for the Court to read this statute into subsection (a), absent any indication of legislative intent to do so. *See Vonn*, 535 U.S. at 65. Third, applying the standards in the MLUL, Block 12 *was* properly zoned for cemetery use when Plaintiff purchased it. If the MLUL were also the guidepost for determining whether a municipality should consent to an applicant's proposed cemetery, as here, then Plaintiff would need to do little else to make the case for its cemetery than

point to the Township's zoning ordinance. The zoning inquiry and the consent inquiry could be coextensive in such a case, despite clear legislative intent that they operate with a different scope and under a different set of considerations. The State appears to admit this as well, arguing that "zoning considerations favor considerably into [a municipality's] determination [under the Cemetery Act]." *See* St. Br., at 18. Notwithstanding these problems, an unrelated regulatory regime does little to satisfy the basic requirement of fair notice. Even in the context of an economic regulation such as subsection (a), one cannot expect Plaintiff to scour unrelated legal codes for guidance.

Because I reject Defendants' contention that subsection (d) provides sufficient context for subsection (a), as well as the State's argument that subsection (a) can fairly be read in the context of the MLUL, the constitutionality of the consent provision must stand or fall on its own terms. I am persuaded that it falls as a delegation without a standard. First, subsection (a) does not provide a statutory definition of consent, narrow the contexts in which consent may or may not granted, or provide any signal whatsoever as to the circumstances under which the Township will approve a new cemetery apart from a waiver. In this sense, subsection (a) does not give applicants in Plaintiff's position, "at the outset," any idea of what they must do or not do, or include or not include, in their applications, *see Fox*, 567 U.S. at 254, which is a far cry from cases in which *somewhat* vague ordinances were not found to be *unconstitutionally* vague. For instance, in *CMR D.N. Corp.*, 829 F. Supp. 2d 290, *aff'd*, 703 F.3d 612, the court rejected the plaintiff's due process challenge to an ordinance requiring that its development plan be "appropriate in scale, density, character, and use for the surrounding community," holding that the ordinance "contains standards and uses which are appropriately delineated in commonplace terms and categories . . . references specific legislative findings that further clarify those standards, . . . . [and in detail] sets forth eight

findings that address the purpose of the overlay area . . . including maintaining the City's vision, encouraging a variety of uses, and driving economic growth." *Id.* at 297 & n.6, 301 & n.21, 302-03.

Or, in *Adhi*, 721 F. Supp. 2d 361, the court rejected the plaintiff's due process challenge because the ordinance "sets forth the considerations for the Zoning Board in determining whether to grant a conditional-use application," with "some of these factors [addressing] whether the proposed use meets the criteria of a conditional use or Defendant's general zoning requirements (such as subsections a, b, c, d, k, l, and m) and others [relating] to a consideration of whether the conditional use will have an impact on the surrounding area not normally expected from such a use (such as subsections f, g, i, and j)." *Id.* at 375-76 & n.4 (holding that the ordinance was void for vagueness under the First Amendment but not the Due Process Clause). "The list include[d] fifteen factors." *Id.* at 376.

Likewise, in *Hotel and Restaurant Employees and Bartenders Intern. Union Local 54 v. Read*, 832 F.2d 263 (3d Cir. 1987), the Third Circuit rejected a vagueness challenge to a provision of the New Jersey Casino Control Act disqualifying registrants who associate with career offenders because "the legislature, in articulating the policies underlying the act and in drafting an objective test into [the provision], has given sufficient direction to those who will enforce [it]." *Id.* at 268-69. And in *Hoffman*, 455 U.S. 498, the Supreme Court rejected the plaintiff's vagueness challenge to an ordinance requiring a business to obtain a license if it sells items "designed or marketed for use with illegal cannabis or drugs," holding that "[a] business person of ordinary intelligence would understand that this term refers to the design of the manufacturer, not the intent of the retailer or customer," and that it is "sufficiently clear that items which are principally used for

nondrug purposes, such as ordinary pipes, are not 'designed for use' with illegal drugs." *Id.* at 491, 503-04.

Other circuits have reached similar conclusions on laws with substantially more substance than subsection (a). In *Mayes v. City of Dallas*, 747 F.2d 323 (5th Cir. 1984), the Fifth Circuit held that an ordinance requiring new buildings to "harmonize" with the "overall character" of a district, or with certain "surrounding structures," did not fail to set forth "objective, articulated standards sufficient to prevent the arbitrary exercise of government power." *Id.* at 324-25. Similarly, in *Henry v. Jefferson Cnty. Planning Comm'n*, 215 F.3d 1318 (4th Cir. June 9, 2000) (table opinion), the Fourth Circuit held that an ordinance requiring projects to be "compatible" with and to "preserve the rural character of the . . . agricultural community" was not unconstitutionally vague, explaining that the term "compatible" had only one logical meaning and that the provisions of the ordinance, plus its stated legislative purpose, provided builders with "sufficient notice and warning as to what requirements [they] must meet in order to obtain" a permit. *Id.* at 4-5; *see also Terson Co., Inc. v. Bakery Drivers and Salesmen Local 194*, 739 F.2d 118, 121 (2d Cir. 1984) (rejecting a vagueness challenge to a provision of the Multiemployer Pension Plan Amendments Act governing withdrawals because it incorporates "reasonable 'actuarial assumptions and methods'").

These laws all share what the consent provision here plainly lacks: *some* standard for guiding the exercise of discretion. *Accord Trade West Management Ass'n, Inc. v. Hughey*, 780 F.2d 221, 236 (3d Cir. 1985) (calling the plaintiff's vagueness challenge to a provision of the New Jersey Solid Waste Management Act of 1970, *see* N.J.S.A. 13:1E-1, *et seq.*, requiring waste collectors to register with the Department of Environmental Protection and setting forth twenty-three criteria for disqualification, *see* N.J.S.A. § 13:1E-133(e), "substantial," though declining to decide that issue); *Holmes v. New York City Housing Authority*, 398 F.2d 262, 265 (2d Cir. 1968)

(stating, in the context of a vagueness challenge to the eligibility requirements for public housing tenants, that "due process requires that selections among applicants be made in accordance with 'ascertainable standards,'" and "[i]t hardly need be said that the existence of an absolute and uncontrolled discretion in an agency of government vested with the administration of a vast program, such as public housing, would be an intolerable invitation to abuse").

Neither does subsection (a) incorporate by reference, or by implication, a common industry word that applicants in Plaintiff's position could use to better understand what is required in order to secure consent, or under what conditions the Township might withhold it. The State arguably proves this point by claiming that, under New Jersey law, "the word consent 'implies a voluntary action, not statutory compulsion,'" St. Br., at 12 (quoting *West Point Island*, 54 N.J. at 345-46), which, of course, suggests no standard whatsoever. This, too, is different from cases in which courts have found statutes to be vague but not unconstitutionally so. *See Williams*, 553 U.S. at 306-07 (explaining that the common legal meaning of *mens rea* terms such as "knowledge, belief and intent" in part renders the statute permissible); *Civil Service Commission v. Letter Carriers*, 413 U.S. 548, 575 (1973) (rejecting a vagueness challenge to the Hatch Act because its scope had been narrowed and defined through "longstanding interpretations" of which ordinary people would be aware); *Dailey v. City of Philadelphia*, 417 F. Supp. 3d 597, 618 (E.D. Pa. 2019) (explaining that the term "malfeasance" in the city's retirement code is not unconstitutionally vague because "people of common intelligence" would not "guess as [to] its meaning and differ as to its application" in the context of using a government credit-card for personal benefit); *Doylestown Elec. Supply Co. v. Maryland Cas. Ins. Co.*, 942 F. Supp. 1018, 1021 (E.D. Pa. 1996) (rejecting a vagueness challenge to the term "bad faith" because "Pennsylvania jurisprudence provides sufficient guidance" to enforcement officials); *see also Weeds*, 255 U.S. at 112 ("In the absence of

a statutory definition of, or method of determining, standard prices . . . the natural standard . . . is . . . the standard of fair market value . . . . So construed, I regard this provision as clearly constitutional."). Here, on the other hand, no amount of research—of other laws, administrative process, Cemetery Board regulations, past Township decisions, or the surrounding provisions in N.J.S.A. § 47:25-1, *et seq*—could adequately inform how Plaintiff should understand the meaning of "consent."

Subsection (a) further fails because Plaintiff does know whether, as a rule, there *are* certain facts or conditions it could present in an application to obtain the Township's consent. Such "indeterminacy" and "unpredictability" as to what "must be proved" to establish a new cemetery cannot pass constitutional muster. *Williams*, 553 U.S. at 306 ("What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."); *Fox*, 567 U.S. at 253 ("[A] regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved."). Instead, the Township's approval turns on "wholly subjective judgments," *Williams*, 553 U.S. at 306, such that the Committee may "condem[n] all that [they] personally disapprove and for no better reason than that [they] disapprove it." *Jordan*, 341 U.S. at 242 (Jackson, J., dissenting).

In short, the municipal consent provision "is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Coates*, 402 U.S. at 614; *Williams*, 553 U.S. at 306. The concern, here, is the provision's lack of limiting principles: it places no boundaries on the Township's power to grant or withhold consent and, to that extent, vests the Township with unfettered discretion. As subsection (a) stands, whether the Township approves a cemetery

application hinges on the whims of the Committee members. With little effort, I can formulate dozens of arbitrary and/or improper reasons why the Township might reject a new cemetery—from the name of an applicant's business or a disagreement with a separate zoning ordinance to cronyism, economic protectionism, ethnic or racial bias, or a preference for a particular religion. The very facts of this case, assuming they are true, provide an example of the unfettered discretion the statute confers: one town Commissioner suggested that, if Plaintiff had proposed a religious cemetery, "this would be a different story," *see* Pl. SUMF, ¶ 27; Pl. Br., Ex. 6 (Hearing Transcript), at 119:1-8-120:1, while the Mayor allegedly stated that the local zoning ordinances contemplated "small church cemeteries" because "Readington's population is . . . majority Catholic."[9] *Id.* Ex. 6 (Hearing Transcript), at 120:16-121:24. The Township is not constrained by subsection (a) in any manner, leaving Plaintiff guessing as to what facts might win approval and the Township free to invent them.

Due process requires more. The Township must make decisions based on some ascertainable standard, not just for any reason or no reason. In turn, applicants in Plaintiff's position must have fair notice *of* the standard. *See Connally*, 269 U.S. at 391. As Justice Gorsuch wrote in *Dimaya*:

> The implacable fact is that this isn't your everyday ambiguous statute. It leaves the people to guess about what the law demands—and leaves [the Township] to make it up. You cannot discern answers to any of the questions this law begets by resorting to the traditional canons of statutory interpretation. No amount of staring at the statute's text, structure, or history will yield a clue. Nor does the statute call for the application of some preexisting body of law familiar to the judicial power. The statute doesn't even ask for application of common experience. Choice, pure and raw, is required. Will, not judgment, dictates the result.

---

9    Two weeks later, in a Committee meeting regarding a proposed ordinance to eliminate cemeteries as a conditional use altogether, the Mayor allegedly reiterated her position that a church cemetery would have been approved in Plaintiff's case. *See* Pl. Br., Ex. 7 (Meeting Transcript), at 3:18-4:8. The Mayor also allegedly stated that, under the new zoning rules, if "a new house of worship . . . wanted to have a cemetery, they could always go to the zoning board." *Id.* at 4:4-8.

138 S. Ct. at 1232 (Gorsuch, J., concurring). Or, as the Supreme Court wrote in *Cohen*

*Grocery Co.*:

> Observe that the section forbids no specific or definite act. It confines the subject-matter of the [consent] which it authorizes to no element essentially inhering in the transaction as to which it provides. It leaves open, therefore, the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against. In fact, . . . to attempt to enforce the section would be the exact equivalent of an effort to carry out a statute which in terms merely penalized and punished all acts . . . when unjust and unreasonable in the estimation of the [Township].

255 U.S. at 91.

Finally, Plaintiff relies on *Yick v. Hopkins*, 118 U.S. 356 (1886), to support its claim that

subsection (a) violates the Due Process Clause. Although Defendants point out that the holding in

*Yick* concerned the plaintiff's as-applied challenge, much of the Supreme Court's reasoning

focused on facial infirmities in the statute.[10] That reasoning is highly persuasive,[11] and Defendants

---

[10]     The Supreme Court passed on the facial challenge in *Yick*, not because one could not be sustained, but because "the facts shown establish an administration directed so exclusively against a particular class of persons as to warrant and require the conclusion that . . . they are applied by the public authorities charged with their administration, and thus representing the state itself, with a mind so unequal and oppressive as to amount to a practical denial by the state of that equal protection of the laws." 118 U.S. at 373.

[11]     Similar reasoning is found in a number of state cases, albeit older ones, concerning municipal consent provisions, some regulating cemeteries, which I also find persuasive. *See, e.g.*, *Finn v. Mun. Council of City of Clifton*, 136 N.J.L. 34, 36-37 (Ct. Errors & Appeals Feb. 10, 1947) (invalidating an ordinance "prohibit[ing] gasoline service stations in business districts 'unless permission is first obtained from the Municipal Council of the City of Clifton'" because that standard "does not lay down a sufficient norm or standard for the guidance of the Municipal Council upon which the granting or refusal of the requested permit may depend"); *Bultman Mortuary Service v . City of New Orleans*, 174 La. 360, 365 (1932) (invalidating an ordinance that prohibited new "[m]ortuary establishments except when granted upon the expressed permission of the commission council" because that "places it within the power of the council to grant or withhold permits . . . according to its whim and fancy"); *Park Hill Development Co. v. City of Evansville*, 190 Ind. 432 (1921) (invalidating an ordinance prohibiting a new cemetery in the city "until a plat of said cemetery has been first filed with and approved by the board of public works of said city and the common council of said city" because that "confer[red] upon certain city officers the arbitrary power to approve or disapprove an offered plat of a cemetery for any reason they might choose, or upon a mere whim, without a reason, and to take different action with regard to different plats under like circumstances"); *Los Angeles Cty. v. Hollywood Cemetery Ass'n*, 57 123 Cal. 344, 349-50 (1899) (invalidating on state constitutional grounds an ordinance making it "unlawful to locate or establish, extend or enlarge, any cemetery, graveyard, burying ground, or crematory, within the limits of the county of Los Angeles, without the permission of the board of supervisors first had and obtained"); *City of Baltimore v.*

have not suggested any basis for rejecting it, so I find it worthwhile to discuss at length. The *Yick* plaintiff challenged San Francisco's ordinance making it illegal to conduct a laundry business without the approval of the board of supervisors, a consent provision virtually identical to the one at issue in this case. Specifically, the San Francisco ordinance made it:

> unlawful . . . for any person or persons to establish, maintain, or carry on a laundry, within the corporate limits of the city and county of San Francisco, *without having first obtained the consent of the board of supervisors*, except the same be located in a building constructed either of brick or stone.

*Id.* at 357 (emphasis added).

In striking down the ordinance, the Supreme Court emphasized its standardless character, again much like the ordinance here, writing that it "does not prescribe a rule and conditions, for the regulation of the use of property for laundry purposes, to which all similarly situated may conform." *Id.* at 368. The Court also emphasized the arbitrary character of the ordinance: it "divides . . . merely by an arbitrary line, on one side of which are those who are permitted to pursue their industry by the mere will and consent of the supervisors, and on the other those from whom that consent is withheld, at their mere will and pleasure." *Id.* The Court concluded with a statement that applies with equal force to this case: "[T]he very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails." *Id.* at 370; *see also State of Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 122 (1928) (citing

---

*Radecke*, 49 Md. 217, 230 (Md. Ct. App. June 27, 1878) ("[T]here is nothing in the ordinance [giving the mayor the power to shut down a steam engine business] to guide or control his action. It lays down no rules by which its impartial execution can be secured, or partiality and oppression prevented . . . . and, when we remember that this action of non-action may proceed from enmity or prejudice, from partisan zeal or animosity, from favoritism and other improper influences and motives easy of concealment, and difficult to be detected and exposed, it becomes unnecessary to suggest or comment upon the injustice capable of being wrought under cover of such a power, for that becomes apparent to every one who gives to the subject a moment's consideration.").

*Yick* for the proposition "[t]he delegation of power [to adjacent landowners to consent to the construction of new homes] is repugnant to the due process clause of the Fourteenth Amendment because "[t]here is no provision for review under the ordinance[,] the failure to give consent is final," and landowners "are free to withhold consent for selfish reasons or arbitrarily and may subject [builders] to their will or caprice").

As in *Yick*, the Township's consent power over new cemeteries is so "naked . . . that, if an applicant for such consent, being in every way a competent and qualified person, and having complied with every reasonable condition demanded by any public interest," should fail "to obtain the requisite consent . . . to the prosecution of his business," 118 U.S. at 366, and challenge that decision, a reviewing court (or state regulatory body) could not begin to discern whether the Township acted properly, because subsection (a) provides no commands, obligations, contingencies, or criteria against which one might judge the Township's decision. Rather, "it would be a sufficient answer for [the Township] to say that the law had conferred upon them authority to withhold their assent, without reason and without responsibility," *id.*, an unconstitutional delegation which "acknowledges neither guidance nor restraint." *Id.* at 367.

Further proving this point, Plaintiff here went to great lengths to make concessions to the Township, including by agreeing to dedicate nearly half of its acreage to public use and to limit its burial area to 38 acres in perpetuity. *See* Pl. Br., Ex. 14 (Letter Requesting Consent). Still, heeding the Township's demands did not cure Plaintiff's doubts as to what facts must be proved under subsection (a) nor ultimately produce the Township's consent, leaving this Court with the distinct impression that there was nothing Plaintiff could have done to win over the Township. *Cf. Letter Carriers*, 413 U.S. at 580 (upholding a vague statute in part because there was a "procedure by which an employee in doubt about the validity of a proposed course of conduct may seek and

obtain advice from the Commission and thereby remove any doubt there may be as to the meaning of the law").

Despite its standardless delegation of power, Defendants and the State make one last argument that subsection (a) is constitutional: it has been on the books for almost 150 years seemingly without issue. *See* State Br., at 15-16; Def. Reply Br., at 6-7. There is some merit to this argument. For example, the Supreme Court has held in the Establishment Clause context that "familiarity itself can become a reason for preservation," *American Legion v. American Humanist Ass'n*, 139 S. Ct. 2068, 2084 (2019) (plurality), and "[t]he passage of time gives rise to a strong presumption of constitutionality." *Id.* at 2085; *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 576 (2014) (finding it persuasive that Congress has opened its sessions with a prayer for more than 200 years and that many state legislatures do so); *Marsh v. Chambers*, 463 U.S. 783, 792 (1983) ("In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with a prayer has become part of the fabric of our society."). History may generate a similar presumption in the Second Amendment context. *See District of Columbia v. Heller*, 554 U.S. 570, 627 n.26 (2008) (observing several "longstanding" gun regulations, which are "presumptively lawful").

However, these cases "must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation." *Town of Greece*, 572 U.S. at 576. They merely "teach[] that [some constitutional provisions, such as the Establishment Clause] must be interpreted 'by reference to historical practices and understandings.'" *Id.* (quoting *County of Allegheny v. American Civil Liberties Union Greater Pittsburg Chapter*, 492 U.S. 573, 670 (Kennedy, J., concurring in judgment in part and dissenting in part)). Hence, "[s]tanding alone, historical patterns cannot justify contemporary violations of constitutional guarantees," *Marsh*,

463 U.S. at 790, but merely provide evidence that a particular practice was never, in fact, unconstitutional. Stated differently: "what matters . . . isn't [a practice's age *per se*] but its compliance with ageless principles," such as those expressed in the Constitution. *American Legion*, 139 S. Ct. at 2102 (Gorsuch, J., concurring in the judgment). Turning to the case at bar, because subsection (a) plainly violates the Due Process Clause, the mere fact that it has operated for a long time cannot save it, and I reject any implication that "the longer the violation the less violative it becomes." *Gonzalez v. North Tp. of Lake County, Ind.*, 4 F.3d 1412, 1422 (7th Cir. 1993) (dismissing "this sort of bootstrapping argument as a defense" and finding no "other case that [has] adopted this reasoning").

In sum, because the Township has unfettered discretion to withhold its consent under subsection (a), which leaves applicants such as Plaintiff in the dark as to what a successful application for a new cemetery requires, it is void for vagueness under the Due Process Clause.

### B. *Remedies*

#### i. <u>Severability</u>

I turn now to the remedy. Defendants first argue that, if subsection (a) is unconstitutional, then I should sever it from the remainder of N.J.S.A. § 45:27-25, because "the invalidation of the consent requirement in subsection (a) would have no impact upon the continued functioning of the waiver provision in subsection (d)." *See* Def. Br., at 30-32. For support, Defendants cite *State v. Lanza*, 27 N.J. 516 (1958), *cert denied*, 358 U.S. 333 (1959), where the New Jersey Supreme Court held that the provisions in a state law should be deemed severable "unless the two are so intimately connected and mutually dependent as reasonably to sustain the hypothesis that the Legislature would not have adopted the one without the other." *Id.* at 528.

On the other hand, Plaintiff contends "that subsection (a) is the threshold requirement set forth in N.J.S.A. 45:27-25," the absence of which would change the scope and purpose of the entire act. *See* Pl. Reply Br., at 11. Specifically, "if subsection (a) were removed, the remaining subsections . . . would be left untethered to any underlying requirement," rendering the statute "even more vague and constitutionally infirm than its present state." *Id.* at 11-12. Plaintiff cites *Chamber of Commerce v. State*, 89 N.J. 131 (1982), for support, where the New Jersey Supreme Court cautioned that, "[a]lthough judicial surgery can be practiced in constitutional adjudications, the occasion for its application is not easy to identify." *Id.* at 152.

Whether a state statute is severable is a question of state law. *See Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam) ("Severability [of a state statute] is of course a matter of state law."); *New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 396 (3d Cir. 2012). The touchstone is legislative intent. *Affiliated Distillers Brands Corp. v. Sills*, 60 N.J. 342, 346 (1972); *Washington Nat'l Ins. Co. v. Board of Review of N.J. Unemployment Compensation Commission*, 1. N.J. 545, 556 (N.J. 1949) ("Severability is a question of intent."); *see also Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 624 (1985) ("It is for the [state] courts to decide, as a matter of state law, whether the state legislature would have enacted the statute without the invalid portion.").

New Jersey courts ascertain legislative intent by asking "whether the objectionable feature of the statute can be exercised without substantial impairment of the principal object of the statute." *Affiliated Distillers*, 60 N.J. at 345 (quotations omitted). Severance is warranted where there is "such a manifest independence of the parts as to clearly indicate a legislative intention that the constitutional insufficiency of the one part would not render the remainder inoperative," *id.* at 346, such as when "the remaining portion [of the statute] forms a complete act within itself."

*Inganamort v. Borough of Fort Lee*, 72 N.J. 412, 423 (1977). Still, "judicial surgery" depends, at all times, on "whether the Legislature would have wanted the statute to survive" without the unconstitutional provision. *Chamber of Commerce*, 89 N.J. at 151-52.

Defendants argue that subsection (a) is a "freestanding provision" which "would have absolutely no impact upon the operation of the waiver provision" in subsection (d) if it were stricken. Def. Br., at 31. Although subsection (d) might be unaffected by severing subsection (a), since it waives the limitation on the number and size of cemeteries imposed by subsections (b) and (c), I must nonetheless examine severance in light of the overall objective of the statute. As such, "[i]t is not enough that the act be severable in fact; its severability in the event of partial invalidity must also have been within the legislative intention." *Lanza*, 27 N.J. at 527. Contrary to Defendants' contention, the result of severance here would not be "slightly less comprehensive legislation." *New Jersey State Chamber of Commerce v. Hughey*, 774 F.2d 587, 597 (3d Cir. 1985) ("[W]here one aspect of a broad regulatory scheme is struck down, the New Jersey Courts are likely to hold that legislative intent is better served by severing the invalid provision . . . , than by striking down the entire statute, which would result in no regulation at all."). Far from a minimal change to the design of N.J.S.A. § 45:27-25, severing subsection (a) would result in a substantial narrowing of the circumstances in which municipalities may consent to new cemeteries despite the legislature's repeated and consistent efforts over the course of 150 years to *broaden* the consent power to cover *all* new cemeteries. *See infra*. To make such a change to the statute would border on a "usurpation of the legislative power." *Washington Nat'l*, 1 N.J. at 556.

In determining whether severing subsection (a) would defeat the principal legislative objective of N.J.S.A. § 45:27-25 as a whole, it is critical to understand the relationship between subsections (d) and (a). Under subsection (d), a municipality may grant consent to a new cemetery

even if the limitations in subsections (b) and (c) apply, *i.e.*, there are more than five cemeteries in a municipality, three percent of municipal land is dedicated to cemeteries, *or* a proposed cemetery is more than 250 acres. *See* N.J.S.A. §§ 45:27-25(b)-(c). Historically, municipalities lacked the power to consent in these circumstances, and thus new cemeteries generally could not open, until the legislature enacted the waiver provision some 100 years after the consent provision in subsection (a) first appeared. *See infra.* Subsection (a), on the other hand, empowers municipalities to grant or withhold consent even if subsections (b) and (c) do not trigger subsection (d), *i.e.*, there are fewer than five cemeteries in town, less than three percent of town land is dedicated to cemeteries, *and* the proposed cemetery is smaller than 250 acres.

When subsection (a) is read in conjunction with subsection (d), it becomes clear that a municipality must *affirmatively authorize* any new cemetery within its borders. *See, e.g.*, *Burke v. Gunther*, 27 Backes 565, 567 (Ct. of Chancery Jan. 23, 1941) ("This consent is what is commonly referred to as the license or franchise for the cemetery."). In this sense, subsection (a) demonstrates a clear legislative intent to always give municipalities a say over new cemeteries, regardless of how many cemeteries currently exist, how big they are, or any other factor. Indeed, under the Cemetery Act, which preempts the field of cemetery regulation, "municipalities have little power to legislate existing cemeteries," *Trinity*, 325 N.J. Super. at 296, but "[t]he residuum of power [they] retain[] on the act is to exclude new cemeteries . . . within their boundaries." *Id.* at 295. In addition, subsection (a) demonstrates a clear legislative intent to give municipalities the *final* say over whether a new cemetery may open. While the original consent provision included a procedure under which an applicant could appeal a municipality's decision to the State Board of Health, *see* L. 1885, p. 166, § 6, and citizens could also appeal to the Health Board a decision they found

objectionable, in 1971 the legislature amended the statute to remove the appeal procedure entirely, leaving municipal decisions unreviewable. *See* N.J. Rev. Stat. 8A:6-5 (1971).

Even more compelling, if subsection (a) were severed, and the conditions in (b) and (c) did not trigger subsection (d), N.J.S.A. § 45:27-25 would not apply at all. In these cases, municipalities would lose their consent power altogether and town zoning committees or planning boards would be newly empowered to decide, in the end, whether new cemeteries may open—despite a longstanding signal from the legislature that municipalities should have the last word all of the time. *See, e.g.*, *Borough of West Long Branch v. Home Building & Realty Co. of Long Beach*, 99 N.J. Eq. 738, 743 (Ct. of Chancery June 8, 1926) ("[I]f it is the intention of the defendant to locate a new cemetery . . . then it would be necessary for the defendant to obtain the consent and approval of the governing body."). Although subsection (a) is just one provision among thirty-eight in the Cemetery Act, severing it from the remainder of the provisions in N.J.S.A. § 45:27-25 frustrates the core legislative plan of that part of the statute—comprehensive municipal consent—such that this Court must invalidate N.J.S.A. § 45:27-25 "as a unitary whole."[12] *Lanza*, 27 N.J. at 527. Because consent in all circumstances is the "dominant aim" of the statute, *Railroad Retirement Board v. Alton R. Co.*, 295 U.S. 330, 362 (1934), unless N.J.S.A. § 45:27-25 operates in its entirety, it will be wholly ineffective in achieving the legislature's statutory design.[13]

---

[12] Legislative intent can also be gleaned from N.J.S.A. § 45:27-25's title, "Consent of municipality for establishment, enlargement of cemetery," which implies that every cemetery must go through the consent process, not merely cemeteries that are otherwise prohibited by subsections (b) and (c). *See, e.g.*, *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 388-89 (1959) ("The Title of the act . . . is . . . a useful aid."); *Maguire v. Commissioner of Internal Revenue*, 313 U.S. 1, 9 (1941) ("While the title of an act will not limit the plain meaning of its text, it may be of aid in resolving an ambiguity.") (internal citations omitted).

[13] It is worth mentioning that none of the current Cemetery Act's thirty-eight provisions contains a severability clause. Of course, "[t]he presence or absence of a [state] severability clause in a statute is not dispositive." *Trade West*, 780 F.2d at 231. And a New Jersey statute of general application provides that, "[i]f any title, subtitle, chapter, article or section of the Revised Statutes, or of any statute or any provision thereof, shall be declared to be unconstitutional, invalid or inoperative, in whole or in part, by a court of competent jurisdiction, such title, subtitle, chapter, article, section or provision shall, to the extent that it is

The enactment and legislative history, which are relevant in New Jersey when construing

a statute, confirm the centrality of subsection (a) to N.J.S.A. § 45:27-25. *See Cedar Park Cemetery*

*v. Hayes*, 132 N.J. Super. 572, 576 (App. Div. Feb. 28, 1975) (interpreting the Cemetery Act "in

the light of its legislative history"); *New Jersey Pharmaceutical Ass'n v. Furman*, 33 N.J. 121, 130

(1960) ("Courts may, of course, freely refer to legislative history and contemporaneous

construction for whatever aid they may furnish in ascertaining the true intent of the legislation.").

New Jersey has regulated cemeteries for 170 years, beginning in 1851, with the Rural

Cemetery Act, which required cemetery associations to incorporate. *See* An Act Authorizing the

Incorporation of Rural Cemetery Associations, L. 1851, p. 254, §§ 1, 4; *Cedar Park*, 132 N.J.

Super. at 576 ("Since 1875, the New Jersey Legislature has recognized the need to regulate places

of interment."). The legislature amended the Act in 1875, to permit cemeteries up to 75 acres. *See*

L. 1875, p. 67, § 4. A few years later, in 1883, it limited the number of cemeteries to three in any

one township. *See* L. 1883, c. 135, § 2. The consent provision appeared around this time, in 1885.

*See* L. 1885, p. 166, § 6 ("[I]t shall not be lawful to locate any new cemetery or burying ground .

. . in this state without the consent and approval of the municipal authorities . . . ."). The legislature

amended these provisions in 1929, 1937, 1971, and 2003. In 1929, it raised the limit on the number

of cemeteries to five. *See* L. 1929, c. 20. And in 1971, it removed a mechanism from the consent

provision under which parties could appeal a municipality's decision to grant or withhold consent.

---

not unconstitutional, invalid or inoperative, be enforced and effectuated and no such determination shall be deemed to invalidate or make ineffectual the remaining titles, subtitles, chapters, articles, sections or provisions." N.J.S.A. § 1:1-10. Even so, on the facts "in each case it is necessary to determine whether, assuming one section of a statute is invalid, the legislature nevertheless would have enacted the remaining parts," *Trade West*, 780 F.2d at 231, and "there may be circumstances which compel a court to conclude that the [New Jersey] Legislature would not have enacted the statute without the inclusion of the objectionable part" despite the presence of a general savings clause. *Group Health*, 40 N.J. at 455.

*See* N.J. Rev. Stat. 8A:6-5 (1971). On the other hand, the legislature did not enact the waiver provision until 1971, almost 100 years later. *See* L. 1971, c. 333.

This history has three major implications. First, before 1971, municipalities could not authorize new cemeteries as long as the conditions in subsections (b)-(c) were present. The initial waiver provision *expanded* the consent power to these circumstances, indicating legislative permission to exercise discretion even if many cemeteries already existed. Second, under the original version of subsection (d) passed in 1971, a municipality could authorize a new cemetery despite subsections (b)-(c) only if "the capacity of an existing cemetery [was] exhausted, so that no further interment spaces can be purchased." *Id.* The legislature then *relaxed* this standard in 1973, *i.e.*, expanded the consent power again, to permit waivers if there is a public need, which governs the provision today. *See* L. 1973, c. 219, § 24. So construed, the legislature has never contemplated, much less passed, a provision narrowing the situations in which a municipality may consent to a new cemetery, as severance would do here, but rather has repeatedly acted to *enlarge* the consent power and *facilitate* the exercise of municipal discretion in new factual scenarios. Third, for over 150 years, subsections (a)-(c) have operated together while subsection (d) is of relatively recent vintage and could not be intended as the only consent-conferring provision in N.J.S.A. § 45:27-25.

Relatedly, because subsection (a) and (d) are different in scope and objective, Defendants' argument that all cemetery applicants could proceed through subsection (d)—assuming the statute could be read to permit such an expansive interpretation of the waiver provision, which is doubtful—must fail. Through the consent provision in subsection (a), the legislature intended to give municipalities the power to contemplate a wide range of considerations in deciding whether to grant to deny a new cemetery—so much so that it is unconstitutionally vague, but that is

nevertheless the intent. On the contrary, through subsection (d), the legislature intended municipalities to consent in more limited factual scenarios: when the "public necessity" or "public interest" warrants it. Had the legislature wanted all cemetery applicants to seek approval under subsection (d), then it could have eliminated subsection (a) in 1971 or 1973. Alternatively, had it wanted all applicants to proceed through subsection (a), then it could have eliminated subsections (b)-(c) rather than enacting a waiver provision. It chose to take neither of these actions, instead adding subsection (d), which applies under a narrower set of circumstances. To channel all cemetery applications through subsection (d)'s more restrictive consent power would defy legislative intent, not to mention rewrite the statute.

I therefore find that subsection (a) is not severable from the other provisions in N.J.S.A. § 45:27-25, and as such, subsections (b)-(d) are invalid.

ii.   <u>Other Remedies</u>

Defendants further suggest that I remand this matter to the New Jersey Cemetery Board to add detail to the statute. I decline to take that course of action. First, it is not clear that I have the authority to remand to the Cemetery Board with an order compelling further rulemaking. The issue is not the Court's power to intervene to remedy subsection (a), but the nature and degree of the requested intervention, which raises sensitive federalism concerns. By ordering rulemaking from a subdivision of state government and a delegee of state legislative power, I might infringe on a core state operation and deprive the legislature of its oversight responsibility, undermining principles of judicial restraint and comity in the process. It would be imprudent to entangle this Court with state-level rulemaking and whatever ongoing monitoring or periodic reporting that entails.

In any event, the Cemetery Board likely lacks the power to make rules regarding the definition of consent. N.J.S.A. § 45:27-4(a) contains the Cemetery Board's primary grant of power: "[it] shall administer the provisions of this act and shall have general supervision and regulation of, and jurisdiction and control over, all cemetery companies and their property, property rights, equipment and facilities." *Id.* I read this provision as empowering the Board to set processes and procedures, not to impose substantive limitations on the discretion that the statute vests in municipalities. I also read it as empowering the Board to bind or penalize cemetery companies, which are the primary regulatory objects of the Act,[14] not other government actors. N.J.S.A. § 45:27-38 confirms this interpretation because that provision empowers the Board to institute actions in the name of the State for violations of its rules, most of which concern cemetery companies. Similarly, although N.J.S.A. § 45:27-4(b) gives the Board the seemingly broad authority "to carry out the purposes of [the Cemetery Act]," the very terms of subsection (a) indicate that its purpose is to give municipalities unrestrained (and, as it turns out, unconstitutional) latitude to reject new cemeteries. Limiting their leeway by rulemaking would undermine rather than carry out that purpose.

*C.  Subsections (b)-(d)*

Finally, the parties dispute whether subsection (d), like subsection (a), is void for vagueness, and whether the Cemetery Act narrowly defines the word "cemetery" such that Rosedale does not need a waiver, *i.e.*, whether the limitation on the number of cemeteries in subsection (b) triggers the waiver provision. Although I do not decide these issues today, I remark that the parties' positions demonstrate that imprecision pervades N.J.S.A. § 45:27-25.

---

14    For example, the Act regulates the organization of cemetery companies, the duties of their governing bodies, the land they may acquire or own, the rights of plot owners as against them, and related cemetery salesmen.

44

The first of these arguments is that subsection (d) contains insufficient limiting principles to guide municipal discretion. *See* Pl. Br., at 24 ("Much like the consent requirement in subsection (a), there is nothing in the statute that supplies a standard to guide the governing body's decision [under subsection (d)]."). Defendants posit that standards similar to those in subsection (d), "[w]hile broad," have long been upheld by state and federal courts. *See* Opp. Br., at 25 (collecting cases). Subsection (d) provides that:

> The governing body of a municipality, by resolution, may waive the limitations of subsection b. or c. of this section if it finds that there is a public need for additional cemetery lands and that it is in the public interest to waive them.

N.J.S.A. § 45:27-25(d). Defendants' argument here has merit, as limited by the discussion below. *See, e.g.*, *Montgomery Nat'l Bank v. Clarke*, 882 F.2d 87, 90 (3d Cir. 1989) ("In the sphere of economic regulation, the Supreme Court has frequently upheld statutes that require administrative agencies to make determinations based upon standards such as the public interest."); *see also FCC v. RCA Communications, Inc.*, 346 U.S. 88, 90 (1953) (upholding a "public interest, convenience, or necessity" standard governing the grant of radio licenses); *Lichter v. United States*, 334 U.S. 742, 786 (1948) (collecting cases upholding statutes prohibiting "excessive profits," providing for "just and reasonable rates," proscribing "unfair methods of competition," and requiring "fair and reasonable rent"). Still, New Jersey courts have observed, public interest "is a broad concept. The constitutional sufficiency of terms of such sweep may not be judged in a vacuum. The context must be considered." *Elizabeth Federal Savings & Loan Association v. Howell*, 30 N.J. 190, 194 (1959) (per curium). As I have found, the context of N.J.S.A. § 45:27-25 is exceedingly vague.

More to the point, Plaintiff argues that subsection (d) is unconstitutional because it is "silent" as to whether a municipality should consider the local or the regional interest in determining whether to grant a waiver to a proposed cemetery. *See* Pl. Br., at 24-25 (concluding

that public interest must be viewed regionally). Defendants argue that public interest must be viewed locally rather than regionally because "1) Plaintiff is seeking to establish a cemetery within Readington Township and the Township Committee is concerned with the interests of the Township and its residents, and 2) the Township Committee does not have the ability to accurately evaluate public need/interest beyond its borders, and 3) there is no legal authority saying that 'public need' and 'public interest' [in subsection (d)] must be viewed regionally." Def. Br., at 8, 23-25; Def. Reply Br., at 2-3.

Surprisingly, the State agrees with Plaintiff, arguing that municipalities acting pursuant to subsection (d) "must consider the welfare of all of the State's citizens, not just the interests of the inhabitants in the particular locality." *See* St. Br., at 18 (quoting *Howell Properties, Inc. v. Twp. of Brick*, 347 N.J. Super. 573, 581 (App. Div. Feb. 13, 2002)). The State then cites to *Duffcon Concrete Products, Inc. v. Cresskill*, 1 N.J. 509 (1949), for the proposition that "the most appropriate use of any particular property depends not only on all the conditions, physical, economic and social, prevailing within the municipality and its needs, present and reasonably prospective, but also on the nature of the entire region in which the municipality is located." *Id.* at 513. The State also points to the Township's municipal code, which seeks to "ensure that the development of Readington Township does not conflict with . . . the general welfare of . . . the state as a whole," § 148-3(c), and "provide sufficient space for a variety of . . . uses . . . both public and private . . . in order to meet the needs of all New Jersey citizens[.]" § 148-3(f).

While I express no opinion on the ultimate merits of this argument, the disagreement between the State and the Township reveals the potential flaws in applying subsection (d). The very reason for requiring standards in a delegation is to ensure that the delegee understands the scope of its power, the ways in which that power should be exercised, and the criteria relevant to

its decisions. Here, although the State has delegated the waiver power to the Township with some standards, the Township and the State diverge sharply as to what those standards command, *i.e.*, whether the local or regional interest should predominate. That disagreement does much to prove Plaintiff's point: subsection (d) may not guide the Township's exercise of discretion in a manner consistent with legislative intent.

The second of these arguments is whether the definition of the word "cemetery" in the Cemetery Act triggers the limitation in N.J.S.A. § 45:27-25(b), such that Plaintiff requires a waiver. Subsection (b) provides that:

> No more than five cemeteries may be established in any one municipality, and not more than 3% of the area of any municipality shall be devoted to cemetery purposes.

*Id.*

The parties' dispute centers on the definition of "cemetery." The Cemetery Act defines "cemetery" as "any land or place used or dedicated for use for burial of human remains or disposition of cremated human remains." N.J.S.A. § 45:27-2. Plaintiff argues that this "quite capacious" definition nevertheless refers only to cemeteries with a Certificate of Authority from the State, *i.e.*, cemetery *companies*, *see* Pl. Reply Br., at 12-18, based on "ample contextual evidence." *See* Pl. Br., at 34 n.12. Specifically, Plaintiff points to (1) a provision of N.J.S.A. § 45:27-2 stating that the statutory definition of "cemetery" does not apply if "context indicates otherwise," (2) the New Jersey Supreme Court decision in *Feuchtbaum v. Mayor and Twp. Committee of Woodbridge*, 12 N.J. Misc. 541 (1934), which, Plaintiff argues, holds that the Cemetery Act applies only to cemeteries organized under the statute, (3) an Attorney General Opinion from 1940 construing a prior version of the Cemetery Act narrowly, *see* N.J. Atty. Gen.

Op. 125 (1940); Pl. Br., Ex. 7, and (4) "basic principles of statutory construction" which "weigh heavily against the Township's all-encompassing definition." *See* Pl. Br., at 37-46.

Defendants respond that, based on a "plain" and "straightforward" reading of the text in the Act, "cemetery" broadly includes any plot of land containing human remains.[15] *See* Def. Reply Br., at 2-3; Def. Br., at 20-22. The State calls both approaches "absurd." *See* St. Br., at 24. It contends that the definition of "cemetery" includes cemeteries that are operated by religious organizations and that restrict burials to members of that faith, *i.e.*, not just cemetery *companies* with a Certificate of Authority, as Plaintiff advocates, but excludes "privately-owned lands where remains have been buried," as advanced by Defendants. *Id.* at 20-25. For support, the State focuses on a 1973 amendment to the Cemetery Act, then § 8A:6-1.1, which included a provision applying the consent provision in subsection (a), the 250-acre limitation in subsection (b), and the five-cemetery limitation in subsection (b) to cemetery companies, religious corporations, and religious societies. *See* L. 1973, c. 219, § 25 (effective Sept. 10, 1973). From this, the State infers that the legislature "intended that cemeteries operated by cemetery companies and those operated by religious corporations be counted *together* for the purposes of determining the number of cemeteries within a single municipality." *See* St. Br., at 22.

Without deciding the scope of the word "cemetery," I again stress that the parties' disagreement indicates a problematic degree of imprecision in N.J.S.A. § 45:27-25. For example, when the legislature reenacted the Cemetery Act in 2003 as part of an ongoing effort to modernize

---

15      Defendants' interpretation of "cemetery" includes religious cemeteries as well as secular ones. A religious group seeking to establish a new cemetery in Readington must therefore obtain a waiver in the normal course under subsection (d) because, based on Defendants' definition, Readington contains over twenty cemeteries, far exceeding the five-cemetery limit imposed by subsection (b). *See* Def. SUMF, ¶ 19. Despite this, the Mayor stated in a subsequent hearing repealing the conditional-use zoning rule for cemeteries that religious groups can apparently seek approval for new cemeteries from the Planning Board directly. *See supra*, note 9. The Mayor's remark may evince an animus toward non-religious cemeteries, which is the basis of Plaintiff's remaining claims.

its code, it removed § 8A:6-1 altogether, even though the recodification commission recommended retaining it. *See* Def. Br., Ex. 8 (Table of Dispositions), at 31; St. Br., at 23. However, the commission commented that the substantive revisions to the Act, which the legislature adopted, were "broadened to reflect § 8A:6-1.1" all the same. *See* Def. Br., Ex. 8 (Table of Dispositions), at 19. The legislature then expressly repealed § 8A:6-1.1 in 2005. *See* L. 2005, c. 324. This convoluted enactment history, among other things, casts doubt on the meaning of "cemetery," despite its seemingly broad definition in N.J.S.A. § 45:27-2, leaving the Court—and apparently all three parties in this case—unsure as to when the five-cemetery limitation in subsection (b) is triggered and the circumstances under which the waiver provision in subsection (d) applies.

## IV.    CONCLUSION

Because N.J.S.A. § 25:27-25(a) is a standardless delegation of state power, it violates the Due Process Clause of the United States Constitution, and because it is not severable from subsections (b)-(d), N.J.S.A. § 45:27-25 is unconstitutional in its entirety. I stay my decision for a period of thirty days to give the New Jersey Legislature the opportunity to enact a new version of N.J.S.A. § 45:27-25, should it wish to do so, *see Freeman v. Fischer*, No. 03-03140, 2012 WL 10205071, at *1 (D.N.J. Apr. 24, 2012), at which time it would be well-advised to clarify the uncertainties in the statute raised by the parties and the Court in this Opinion. Plaintiff's Motion for Summary Judgment is **GRANTED** and Defendants' cross-motion is **DENIED**.


**DATED**:  December 30, 2020                          /s/ Freda L.  Wolfson
                                                       Freda L.  Wolfson
                                                       U.S. Chief District Judge